WO              IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


JEANETTE K. LANSBURG and )
LARRY J. ENCINAS, )
 )
                              Plaintiffs, )
 )
       vs. )
 )
FEDERAL HOME LOAN MORTGAGE )
CORPORATION, et al., )
 )          No. 2:11-cv-1529-HRH
                              Defendants. )
_____)


O R D E R

Motion to Dismiss

Defendants move to dismiss plaintiffs' second amended complaint.[1]  This motion is

opposed.[2]  Oral argument was not requested and is not deemed necessary.

Background

Plaintiffs are Jeanette K. Lansburg and Larry J. Encinas.  Defendants are Federal

Home Loan Mortgage Corporation ("Freddie Mac") and Saxon Mortgage Services, Inc.

("Saxon").

_____

[1]Docket No. 91.

[2]Docket No. 98.

Plaintiffs allege that in February 2007, they "entered in to a mortgage/deed of trust/security deed/note with Taylor Bean & Whitaker for real property located at 14394 West Shaw Butte Drive, Surprise, Arizona 85379...."[3]  Plaintiffs allege that on March 1, 2008, they "entered in to [a] loan modification ... with .... Taylor Bean & Whitaker."[4]

Plaintiffs allege that "[s]everal months after the March 2008 loan modification," they "again began experiencing monetary difficulties" and they "were unable to pay the loan modification payments under the terms of the" March 2008 loan modification.[5]  Plaintiffs allege that due to the financial difficulties they were having they "became certified foster parents" and received in excess of $5,000 per month for being foster parents.[6]

Plaintiffs allege they "were advised they were in default under the promissory note and Deed of Trust" and that Taylor, Bean & Whitaker sent a notice concerning the breach to" them.[7]  Thus, in March 2009, plaintiffs allege that they "sought a second loan modification"[8] and that on May 11, 2009, they "sent in a formal loan modification package in

---

[3]Plaintiffs' Second Amended Complaint at 2, ¶ 5, Docket No. 86.

[4]Id. at 3, ¶ 9.

[5]Id. at ¶¶ 15-16.

[6]Id. at 4, ¶¶ 21 & 23.

[7]Id. at ¶¶ 24-25.

[8]Id. at ¶ 17.

accordance with the newly issued rules and regulations under the HAMP program."[9] Plaintiffs allege that in June 2009, they "executed the Home Affordable Modification Trial Period Plan ('TPP') with the Defendants and sent in the first monthly payment of $1739.70."[10]  Plaintiffs allege that they mailed the TPP agreement to "Taylor Bean & Whitaker...."[11]

Plaintiffs allege that they "made all [the] required monthly payments under the terms of the TPP."[12]  They also allege that they "provided every financial document requested by the Defendants during the term of the TPP" agreement.[13]

Plaintiffs allege that they "were aware Saxon was the new servicer of the mortgage starting after the third TPP payment was made in August 2009."[14]

Plaintiffs allege that "Taylor Bean & Whitaker, as well as Saxon [M]ortgage failed to comply with their requirements under the HAMP regulations and guidelines, Arizona law and the TPP and failed to provide a signed copy of the TPP despite receiving all the

---

[9]Id. at ¶ 26.

[10]Id. at 5, ¶ 27.

[11]Id. at ¶ 29.

[12]Id. at 6, ¶ 34.

[13]Id. at 8, ¶ 53.

[14]Id. at 6, ¶ 37.

payments required under the TPP to be made by the Plaintiffs."[15]   Plaintiffs allege that despite this non-compliance, "Taylor, Bean & Whitaker and Saxon continued to accept payments under the TPP, [and] continued to instruct the Plaintiffs to make payments under the TPP even after the 3 month trial period ended...."[16]

Plaintiffs allege that their home was sold at a trustee sale conducted by Saxon on June 14, 2010.[17]  The home sold for $240,000.[18]  At the time of the sale, the amount of the unpaid debt on the underlying loan was $482,178.96.[19]  Plaintiffs allege that they did not learn of the sale until after it had been conducted.[20]

Although the property had already been sold, plaintiffs allege that in September 2010, they were "advised in writing ... that they were denied for a loan modification based upon failure to make TPP payments" and that their home would be foreclosed on in thirty days.[21]

Plaintiffs allege that

> [a]s a result of the [D]efendants['] conduct, [they] lost their
> home, lost their monthly income as foster parents, lost the

---

[15]Id. at 5, ¶ 32.

[16]Id. at ¶ 33.

[17]Id. at 6, ¶¶ 36 & 40.

[18]Trustee's Deed upon Sale at 1, Exhibit D, Defendants['] ... Request for Judicial Notice, Docket No. 78.

[19]Id.

[20]Plaintiffs' Second Amended Complaint at 6, ¶ 36, Docket No. 86.

[21]Id. at ¶ 39.

> monthly TPP payments paid and were forced to incur debts in being forcibly removed from their home by the constable, including incurring attorney fees and costs in defending against a forcible detainer, moving costs and expenses in setting up temporary housing for themselves.[22]

Plaintiffs also allege that "as a further consequence of the Defendants['] breach of the TPP and its requirements, ... Lansburg suffered numerous medical bills from stress directly related to the Defendants['] failure to comply with the TPP" agreement.[23]

Plaintiffs commenced this action against defendants and MTC Financial, Inc. on July 6, 2011 in state court and it was subsequently removed to this court.  In their original complaint, plaintiffs asserted five claims:  1) a claim for declaratory relief, 2) a conversion of real property/slander of title claim, 3) a breach of fiduciary duty claim, 4) a breach of the implied covenant of good faith and fair dealing claim, and 5) a material misrepresentation claim.  MTC was dismissed as a party on September 15, 2011.[24]  On January 5, 2012, defendants' motion to dismiss was granted in part and denied in part.[25]  Plaintiffs' "request for a declaration that Defendants are not legally entitled to enforce the underlying Deed of Trust or promissory note under their former terms due to the modifications that occurred" and their claim "for violation of the covenant of good faith and fair dealing" survived defendants'

---

[22]Id. at 8, ¶ 54.

[23]Id. at ¶ 55.

[24]Docket No. 10.

[25]Docket No. 22.

motion to dismiss.[26]  On October 31, 2012, defendants moved for summary judgment on these remaining claims.[27]  On March 7, 2013, the court granted defendants' motion for summary judgment.[28]

Plaintiffs appealed and the Ninth Circuit vacated this court's judgment based on Corvello v. Wells Fargo Bank, N.A., 728 F.3d 878 (9th Cir. 2013).  In Corvello, the Ninth Circuit "held that '... a TPP Agreement offered pursuant to HAMP is a contract, and a party to that contract may sue for breach if the lender violates a term contained within the four corners of the TPP.'"  Meixner v. Wells Fargo Bank, N.A., 101 F. Supp. 3d 938, 947 (E.D. Cal. 2015) (quoting Lazo v. Caliber Home Loans, Inc., No. 1:13–CV–2015 AWI JLT, 2015 WL 590663, at *5 (E.D. Cal. Feb. 12, 2015)).  Under Corvello, a borrower has a valid claim for breach of the TPP agreement if the borrower has "fulfilled all of [his] obligations under the TPP, and the loan servicer has failed to offer a permanent modification[.]"  Corvello, 728 F.3d at 884.

The Ninth Circuit remanded the case to this court.[29]  Upon remand, plaintiffs were given leave to amend their original complaint.[30]

---

[26]Id. at 16.

[27]Docket No. 37.

[28]Docket No. 55.

[29]Docket No. 61.

[30]Docket No. 65.

On March 15, 2016, plaintiffs filed a First Amended Complaint in which they asserted five claims:  1) a claim for declaratory relief, 2) a claim for wrongful disclosure, 3) a claim for breach of contract, 4) a claim for breach of the implied covenant of good faith and fair dealing, and 5) a claim for negligence.[31]   Defendants moved to dismiss plaintiffs' First Amended Complaint.[32]   On June 8, 2016, the court granted the motion to dismiss plaintiffs' First Amended Complaint.[33]   Plaintiffs were, however, given leave to amend as to their breach of contract claim and their breach of the implied covenant of good faith and fair dealing claim.[34]   In giving plaintiffs leave to amend their breach of contract claim, the court reminded plaintiffs that "in addition to clearly alleging that they had a TPP agreement with defendants, that they satisfied their obligations under the TPP agreement, and how defendants breached the agreement, plaintiffs must specifically allege what damages they are asserting flow from the alleged breach of contract."[35]   In giving plaintiffs leave to amend their breach of the implied covenant claim, the court "again reminded" plaintiffs "that they must allege specific damages flowing from the alleged breach of the implied covenant.  It is not sufficient to merely allege that they have been damaged as a result of defendants'

---

[31]Docket No. 74.

[32]Docket No. 77.

[33]Docket No. 82.

[34]Id. at 20.

[35]Id. at 13.

actions."[36]   The court also reminded plaintiffs that "tort damages are only available for a breach of the implied covenant claim if there is a 'special relationship' between the parties" and advised plaintiffs that it "doubt[ed] that ... the HAMP regulations impose a fiduciary duty on a loan servicer."[37]

On July 22, 2016, plaintiffs filed their Second Amended Complaint in which they assert a breach of contract claim and a breach of the implied covenant of good faith and fair dealing claim.  Plaintiffs allege that defendants breached the TPP agreement "by failing to comply with their duties which included either offering a loan modification on the 91st day after the TPP was executed or denying such modification."[38]  Plaintiffs allege that defendants breached the implied covenant by not sending them a signed copy of the TPP agreement, by requiring them to continue making monthly payments after the TPP agreement had expired, and by foreclosing on the property prior to giving written notice.[39]

Defendants now move to dismiss plaintiffs' Second Amended Complaint.

<u>Discussion</u>

"To survive a Rule 12(b)(6) motion to dismiss, a 'plaintiff must allege enough facts to state a claim to relief that is plausible on its face.'"   <u>Turner v. City and County of San</u>

---

[36]<u>Id.</u> at 16.

[37]<u>Id.</u>

[38]Plaintiffs' Second Amended Complaint at 10, ¶ 67, Docket No. 86.

[39]<u>Id.</u> at 11, ¶¶ 73-75.

<u>Francisco</u>, 788 F.3d 1206, 1210 (9th Cir. 2015) (quoting <u>Lazy Y Ranch Ltd. v. Behrens</u>, 546 F.3d 580, 588 (9th Cir. 2008)).  "In assessing whether a party has stated a claim upon which relief can be granted, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party; but 'conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal.'" <u>Id.</u> (quoting <u>Cousins v. Lockyer</u>, 568 F.3d 1063, 1067 (9th Cir. 2009)).  "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).  "This standard 'asks for more than a sheer possibility that a defendant has acted unlawfully,' but it 'is not akin to a probability requirement.'"  <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 678).  "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." <u>Moss v. U.S. Secret Service</u>, 572 F.3d 962, 969 (9th Cir. 2009) (quoting <u>Iqbal</u>, 556 U.S. at 678).

Defendants argue that plaintiffs have failed to allege a plausible breach of contract claim.  "In an action on a contract plaintiff has the burden of proof to show, 1) a contract, 2) a breach, and 3) damages." <u>Thunderbird Metallurgical, Inc. v. Ariz. Testing Laboratories</u>, 423 P.2d 124, 126 (Ariz. Ct. App. 1967).

Defendants first argue that plaintiffs have failed to adequately allege the existence of a contract between them and defendants.  Plaintiffs' breach of contract claim is based on a

breach of the TPP agreement. Thus, in order to state a plausible breach of contract claim, plaintiffs must allege that they entered into a TPP agreement with defendants. Defendants acknowledge that plaintiffs have made an allegation that they entered into a TPP agreement with "[d]efendants."[40] But, defendants contend that the TPP agreement was actually between plaintiffs and Taylor Bean. In support of this contention, defendants cite to a document attached to their request for judicial notice filed in connection with their motion for summary judgment. This document is entitled "Home Affordable Modification Trial Period Plan" and it was signed by plaintiffs.[41] But, the document was not signed by Taylor Bean or Sparta (the loan servicer prior to Saxon); so this document does not suggest, as defendants contend, that the TPP agreement was between plaintiffs and Taylor Bean.

In their Second Amended Complaint, plaintiffs make a conclusory allegation that they entered into a TPP agreement with "defendants"[42] and the supporting factual allegations indicate that they sent the TPP agreement to Taylor Bean and that by the time Saxon became the servicer, the trial plan period had already expired. This would seem to suggest that defendants were not parties to the TPP agreement, which would mean that plaintiffs have not stated a plausible breach of contract claim. However, there is authority that stands for the proposition that "the HAMP guidelines do not allow for a loan servicer ... to negate a loan

---

[40]Id. at 5, ¶ 27.

[41]Exhibit C, Defendants' Request for Judicial Notice [etc.], Docket No. 36.

[42]Plaintiffs' Second Amended Complaint at 5, ¶ 27, Docket No. 86.

modification contract by transferring the loan to a third party...." <u>Romero v. Nationstar</u>

<u>Mortg. LLC</u>, Case No. 14–cv–02954–TLN–DAD, 2015 WL 4393969, at *5 (E.D. Cal. July

15, 2015).

In <u>Romero</u>, the plaintiff started a Trial Plan Period with BAC and made the three

required payments. <u>Id.</u> at *1. The plaintiff alleged that BAC then failed to provide a loan

modification agreement. <u>Id.</u> The plaintiff filed bankruptcy but continued to attempt to

finalize the loan modification but BAC said it could not finalize the agreement while the

plaintiff was in bankruptcy proceedings. <u>Id.</u> After his bankruptcy discharge, the plaintiff

resumed his attempts to finalize the loan modification, but by that time his loan had been

transferred to a new loan servicer, defendant Nationstar. <u>Id.</u> The plaintiff brought a breach

of contract claim against Nationstar, alleging that Nationstar had "breached a contract by

failing to offer a loan modification after completion of the TPP[.]" <u>Id.</u> at *3. Nationstar

moved to dismiss the plaintiff's breach of contract claim. <u>Id.</u> at *2. Nationstar argued that

the breach of contract claim failed because "the TPP terminated by its own terms before the

loan assignment to [Nationstar] occurred [and] [Nationstar] cannot be liable for the breach

of contract claim because [it was] not a party to the TPP[.]" <u>Id.</u> at *3. The court rejected this

argument explaining that

> [l]iability is also imposed by the terms of participation in
> HAMP. Loan servicers, such as [Nationstar] and BAC, are
> required to sign a Servicer Participation Agreement ("SPA"),
> which addresses this issue. The "Servicer Handbook" states that
> if loans eligible to participate in the HAMP program ("eligible
> loans") are transferred, the transferee servicer assumes the

obligations of the transferor under their own SPA.   If the transferee servicer has not signed an SPA, then section 8(A) of the template SPA states that an "Assignment and Assumption Agreement" ("Assignment") must be completed when transferring loans, and that the Assignment must list all the eligible loans being transferred.  The Assignment itself, Exhibit D to the SPA, states that "Assignor has agreed to assign to Assignee all of its rights and obligations under the [Servicer Participation Agreement]" for all eligible loans (emphasis added).  Finally, section (C)(3) of the SPA states that the servicer may not transfer or assign any "mortgage loans or servicing rights" in a way that circumvents, either directly or indirectly, the servicer's obligations under the SPA.

Thus, whether or not [Nationwide] signed an SPA, [it] assumed the obligations of BAC when [it was] assigned Plaintiff's loan.  If [Nationstar] is a participating servicer, then [it is] obligated under [its] own SPA.  If [it is] not a participating servicer, then the Assignment and Assumption Agreement expressly transfers the obligations of the assignor.  Simply stated, the HAMP guidelines do not allow for a loan servicer (i.e., BAC) to negate a loan modification contract by transferring the loan to a third party (i.e., Defendant).

Id. at *5.

The same may be true here.  The fact that Saxon was not the original loan servicer when plaintiffs entered into the TPP agreement does not necessarily mean that Saxon (and Freddie Mac)[43] might not be liable for the alleged breach of the TPP agreement.  It is at least plausible that Saxon assumed the obligations of Taylor Bean (or Sparta) when plaintiffs' loan was transferred.

---

[43]Contrary to defendants' contention, it is at least plausible that Saxon was the agent of Freddie Mac.

Defendants next argue that plaintiffs' breach of contract claim fails because plaintiffs have not adequately alleged contract damages. "[D]amages for breach of contract are those damages which arise naturally from the breach itself or which may reasonably be supposed to have been within the contemplation of the parties at the time they entered the contract." All American School Supply Co. v. Slavens, 609 P.2d 46, 48 (Ariz. 1980).

Plaintiffs' damages allegations are in paragraphs 54 and 55 of the Second Amended Complaint. In paragraph 54, plaintiffs allege that

> [a]s a result of the Defendants['] conduct, [they] lost their home, lost their monthly income as foster parents, lost the monthly TPP payments paid and were forced to incur debts in being forcibly removed from their home by the constable, including incurring attorney fees and costs in defending against a forcible detainer, moving costs and expenses in setting up temporary housing for themselves.[44]

In paragraph 55, plaintiffs allege that "Lansburg suffered numerous medical bills from stress directly related to the Defendants['] failure to comply with the TPP" agreement.[45]

It is at least plausible that some of these alleged damages were reasonably foreseeable. For example, it may have been reasonably foreseeable that plaintiffs would incur costs in connection with being evicted from their home.

In sum, as to plaintiffs' breach of contract claim, it is plausible that defendants may be liable for the alleged breach of the TPP agreement. Plaintiffs have also alleged some

---

[44]Plaintiffs' Second Amended Complaint at 8, ¶ 54, Docket No. 86.

[45]Id. at ¶ 55.

damages in connection with the alleged breach of the TPP agreement that may have been reasonably foreseeable.  Thus, plaintiffs have stated a plausible breach of contract claim.

Defendants next argue that plaintiffs' breach of the implied covenant of good faith and fair dealing claim is not plausible.  "[T]he covenant of good faith and fair dealing is legally implied in every contract."  Burkons v. Ticor Title Ins. Co. of Calif., 813 P.2d 710, 720 (Ariz. 1991).  "[T]he covenant forbids a party to a contract from doing anything denying the right of the other to receive the benefits that flow from the contract."  Id.  "[T]he remedy for breach of this implied covenant is ordinarily by action on the contract, but in certain circumstances, the breach of the implied covenant may provide the basis for imposing tort damages."  Id.  Tort damages are available for "contracts in which there is a special relationship between the parties arising from elements of public interest, adhesion, and fiduciary responsibility."  Id.

Defendants argue that to the extent that plaintiffs are asserting a tortious breach of the implied covenant of good faith and fair dealing claim that claim must fail because there is no special relationship here.  Defendants argue that there is no special relationship between a borrower and a lender.  See McAlister v. Citibank (Arizona), a Subsidiary of Citicorp, 829 P.2d 1253, 1259 (Ariz. Ct. App. 1992) (holding that there was no special relationship between the parties based on McAlister receiving a $500,000 credit line from Citibank); see also, Urias v. PCS Health Systems, Inc., 118 P.3d 29, 35 (Ariz. Ct. App. 2005) (observing

that "[a] commercial contract creates a fiduciary relationship only when one party agrees to serve in a fiduciary capacity").

Plaintiffs argue that it is plausible that there was a special relationship between them and defendants, and they cite to a recent Montana case as persuasive authority in support of this argument.  In <u>Morrow v. Bank of America, N.A.</u>, 324 P.3d 1167, 1173 (Mont. 2014), the Morrows attempted "to secure a modification of their home loan, serviced by Bank of America, through the federal Home Affordable Modification Program (HAMP)."  The Morrows alleged that they were orally told that they had been approved for a TPP, that they made the required TPP payments, but that they were later advised in writing that their request for a loan modification had been denied.  <u>Id.</u> at 1173-1175.  The Morrows brought suit against Bank of America, asserting a number of claims, including a tortious breach of the covenant of good faith and fair dealing claim.  <u>Id.</u> at 1175.  The trial court dismissed that claim on motion for summary judgment on the grounds that Bank of America owed no duty to the Morrows.  <u>Id.</u>  The Montana Supreme Court reversed, holding that the Bank of America owed a fiduciary duty to the Morrows.  <u>Id.</u> at 1177-78.  Under Montana law, "[a] bank owes a fiduciary duty only when it gives advice 'other than that common in the usual arms-length debtor/creditor relationship.'"  <u>Id.</u> at 1177 (quoting <u>Coles Dep't Store v. First Bank, N.A.</u>, 783 P.2d 932, 934 (Mont. 1989)).  The court found that the Morrows had "alleged facts which, if proven, would establish that Bank of America owed them a fiduciary duty[,]" in particular the fact that "Bank of America advised them it would be in their best

-15-

interests to deliberately miss a payment and default on their loan." Id. at 1177-78.  The court

explained that in the wake of the foreclosure crisis,

> [s]ome courts have held that a mortgage servicer actively
> engaging with a borrower, particularly in the modification
> context, stands in a different relation to the borrower than does
> a traditional "silent lender."  Those courts have found, as we do
> today, that special circumstances, if proven, could support a
> fiduciary duty where Defendant went beyond its conventional
> role as a loan servicer by soliciting Plaintiffs to apply for a loan
> modification and by engaging with them for several months[.]

Id. at 1178 (internal citations and quotations omitted).

Plaintiffs argue that they have alleged that Saxon continued to actively engage with

them for several months and continued to instruct them to make their monthly payments even

though the 3-month trial plan period had expired.   Plaintiffs insist that the parties'

interactions went well beyond that of a borrower and "silent lender."  Thus, plaintiffs argue

that it is plausible that defendants had a special relationship with them.

Defendants argue that plaintiffs' reliance on Morrow is misplaced because there are

no allegations in this case that defendants advised plaintiffs to default on their loan or to

make reduced payments on their loan.  But, Morrow cannot be read that narrowly.  Morrow

stands for the proposition that if the loan servicer goes beyond the ordinary role of a lender

and actively engages with the borrower and  advises the borrower as to what to do, then the

loan servicer may have a fiduciary duty to the borrower.  That said, Morrow is based on

Montana law, not Arizona law, which governs plaintiffs' breach of the implied covenant

claim.

-16-

> Only once has an Arizona court held that a fiduciary relationship existed between a bank and its customer. In <u>Stewart</u>, the supreme court concluded that a fiduciary duty was owed by a bank to its customer because (1) the bank acted as the customer's financial advisor for many (twenty-three) years, and (2) the customer relied upon the bank's financial advice.

<u>Wilson v. PNC Mortg.</u>, Case No. 1 CA–CV 14–0024, 2015 WL 448601, at *9 (Ariz. Ct. App. Feb. 3, 2015) (citation omitted).  While plaintiffs may have relied on Saxon's advice, they have not alleged, nor can they allege, that they had a long-standing relationship with Saxon.  Thus, plaintiffs have not, and cannot, state a plausible tortious breach of the implied covenant claim under Arizona law.

Conclusion

Defendants' motion to dismiss[46] is granted in part and denied in part.  The motion is granted as to plaintiffs' tortious breach of the implied covenant of good faith and fair dealing claim but is otherwise denied.  Plaintiffs are not given leave to amend as to their tortious breach of the implied covenant claim as amendment would be futile.  <u>See</u> <u>Carrico v. City & Cnty. of San Francisco</u>, 656 F.3d 1002, 1008 (9th Cir. 2011) (court may dismiss a complaint without leave to amend "if amendment would be futile.").

DATED at Anchorage, Alaska, this 12th day of October, 2016.

/s/ H. Russel Holland<br>United States District Judge

---

[46]Docket No. 91.