WO            IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


JEANETTE K. LANSBURG and          )
LARRY J. ENCINAS,                 )
                                  )
                    Plaintiffs,   )
                                  )
        vs.                       )
                                  )
FEDERAL HOME LOAN MORTGAGE         )
CORPORATION, et al.,              )
                                  )        No. 2:11-cv-1529-HRH
                    Defendants.   )
_____)


O R D E R

<u>Cross-Motions for Summary Judgment</u>

Defendants move for summary judgment.[1]  This motion is opposed and plaintiffs

cross-move for summary judgment.[2]  Plaintiffs' cross-motion is opposed, and defendants

move to strike facts asserted in plaintiffs' response to defendants' motion for summary

judgment.[3]  Defendants also request that sanctions be imposed against plaintiffs for filing a

sham declaration.[4]  Defendants' motion to strike and request for sanctions is opposed and

_____

[1]Docket No. 120.

[2]Docket Nos. 135 and 136.

[3]Docket No. 141.

[4]Docket No. 141.

-1-

plaintiffs request that sanctions be imposed against defendants.[5]  Oral argument was requested and has been heard.

Facts

Plaintiffs are Jeanette K. Lansburg and Larry J. Encinas.  Defendants are the Federal Home Loan Mortgage Corporation and Saxon Mortgage Services, Inc.

On February 1, 2007, plaintiffs executed a Deed of Trust[6] in favor of Taylor Bean and Whitaker Mortgage Corporation ("Taylor Bean") which encumbered the real property located at 14394 West Shaw Butte Drive, Surprise, Arizona ("the Property").  The Deed of Trust contained a power of sale provision in the event of a default under the Deed of Trust.[7]

In March 2008, plaintiffs entered into a loan modification with Taylor Bean in order to prevent a foreclosure.  This loan modification did not limit the default remedies available under Section 22 of the Deed of Trust.

Several months after this first loan modification, plaintiffs again began experiencing financial difficulties and in February or March of 2009, plaintiffs sought a second loan

---

[5]Docket No. 149.

[6]Exhibit A, Declaration of Saxon in Support of Defendants' Motion for Summary Judgment, Docket No. 123.  Defendants also requested that the court take judicial notice of the Deed of Trust as well as several other documents.  See Docket No. 121.  The court need not take judicial notice of any of the documents attached as exhibits to Docket No. 121 because these documents are either submitted elsewhere as exhibits or the court did not rely on them in reaching its decision on the instant motions.

[7]Deed of Trust at 10-11, § 22, Exhibit A, Saxon Declaration, Docket No. 123.

modification from Taylor Bean. It is this second loan modification attempt that is at issue in the instant motions for summary judgment.

On May 6, 2009, Taylor Bean advised plaintiffs that they might qualify for a loan modification under the Home Affordable Modification Program ("HAMP").[8] HAMP was started in 2009 "to incentivize banks to refinance mortgages of distressed homeowners so they could stay in their homes." Corvello v. Wells Fargo Bank, NA, 728 F.3d 878, 880 (9th Cir. 2013). To start the HAMP loan modification process, "borrowers supply information about their finances and their inability to pay their current mortgage to the servicer, and the servicer ... evaluate[s] whether the borrowers qualify for a loan modification." Id. Plaintiffs supplied this initial information to Taylor Bean sometime in May 2009.

"For borrowers who appear eligible to participate in HAMP, the servicer then prepares a" Trial Period Plan ("TPP"). Id. "The TPP requires borrowers to submit documentation to confirm the accuracy of their initial financial representations, and to make trial payments of the modified amount to the servicer." Id. at 880–81. On June 2, 2009, plaintiffs were advised that they were eligible for HAMP and they were provided a TPP to sign.[9] Plaintiffs were advised to sign the TPP and send two signed copies of the TPP plus their first trial period payment of $1739.70 to Sparta Special Servicing no later than June 12, 2009.[10]

---

[8]Exhibit 7 at 1, Declaration of Michael S. DeFine [etc.], Docket No. 131.

[9]Exhibit C at 2, Saxon Declaration, Docket No. 123.

[10]Id.

The TPP provided that "[i]f I am in compliance with this Trial Period Plan ["TPP"] and my representations in Section 1[11] continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement...."[12] The TPP provided that "[t]his Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature."[13] The TPP required plaintiffs to make three trial payments of $1739.70.[14] The TPP provided that the payments were due on June 12, 2009; July 1, 2009; and August 1, 2009.[15] Lansburg handwrote a note on the TPP, asking if the July and August payments could "be paid by the 8th of the month?"[16] Lansburg testified that she never received anything in writing confirming that plaintiffs could make the July and August payments on the 8th of the month but that she did receive verbal confirmation.[17]

---

[11]Section 1 of the TPP requires the borrower to certify that he or she can no longer afford his or her mortgage payments, that the borrower lives in the property, that the borrower will provide documentation of income, and that the borrower will obtain credit counseling, if requested to do so. Home Affordable Modification Trial Period Plan at 1, Exhibit D, Saxon Declaration, Docket No. 123.

[12]Id. at 1.

[13]Id.

[14]Id. at 2.

[15]Id.

[16]Id.

[17]October 8, 2012 Deposition of Jeanette K. Lansburg at 117:16-20, Exhibit 3, Declaration of Tim Pomeroy [etc.], Docket No. 122.

The TPP further provided that

> [i]f prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents, and any payment I make under this Plan shall be applied to amounts I owe under the Loan Documents and will not be refunded to me[.[18]]

The TPP provided that the Modification Effective Date was "the first day of the month following the month in which the last Trial Period Payment is due...."[19] It is undisputed that the Modification Effective Date for plaintiffs' TPP was September 1, 2009.

Plaintiffs signed the TPP on June 10, 2009 and sent it, along with their first trial period payment, to Sparta Special Servicing. Plaintiffs' check (check number 1109) for their first trial period payment was made out to Sparta Special Servicing, had plaintiffs' Taylor Bean loan number in the memo line, and was endorsed by Taylor Bean.[20] This check cleared plaintiffs' checking account on June 18, 2009.[21] Plaintiffs' check (check number 1112) for their second trial period payment was dated July 7, 2009, was made out to Sparta Special

---

[18]Home Affordable Modification Trial Period Plan at 2, Exhibit D, Saxon Declaration, Docket No. 123.

[19]Id.

[20]Exhibit 1, Supplemental Declaration of Michael S. DeFine [etc.], Docket No. 150.

[21]Id.; Exhibit 1 at Lans000731, Pomeroy Declaration, Docket No. 122.

Servicing, had plaintiffs' Taylor Bean loan number in the memo line, and was endorsed by Taylor Bean.[22] This check cleared plaintiffs' checking account on July 16, 2009.[23]

On July 7, 2009, plaintiffs filed for Chapter 7 bankruptcy protection.[24]

On August 6, 2009, Lansburg emailed Taylor Bean to advise that she was getting paid the next day (August 7) and would be overnighting plaintiffs' third trial period payment.[25] Lansburg testified that she had no evidence that she overnighted the third trial period payment the next day, that she did not "think [she] kept those receipts."[26]

Lansburg wrote check number 1118 on what appears to be August 8, 2009, for $1740.[27] Check number 1118 was made out to Sparta Special Servicing and had "Aug Pmt" in the memo line.[28] Plaintiffs' Taylor Bean loan number was written above the "Aug Pmt" notation, but was crossed out.[29] Above the crossed-out Taylor Bean loan number, plaintiffs'

---

[22]Exhibit 2, DeFine Supplemental Declaration, Docket No. 150.

[23]Id.

[24]Case No. 2:09-bk-15624-CGC. Plaintiffs were granted a Chapter 7 discharge on October 28, 2009. Docket No. 41 in Case No. 2:09-bk-15624-CGC.

[25]Email from Jeanette Lansburg to Michelle Christian, Exhibit F at 1, Saxon Declaration, Docket No. 123.

[26]April 12, 2017 Deposition of Jeanette K. Lansburg at 94:9-12, Exhibit 5, Pomeroy Declaration, Docket No. 122.

[27]Exhibit 3, Supplemental DeFine Declaration, Docket No. 150.

[28]Id.

[29]Id.

Saxon loan number was written.[30]  Check number 1118 did not clear plaintiffs' checking

account until September 14, 2009.[31]  Check number 1118 was endorsed by Saxon.[32]

On August 19, 2009, a "welcome letter" was mailed to plaintiffs advising them that

Saxon was taking over the servicing of their loan.[33]  The letter advised that Saxon would start

accepting payments on August 11, 2009.[34]  The letter further advised that "[t]here may be an

initial posting delay due to the servicing transfer, but it will not negatively impact your

payment record."[35]  "Any funds sent to Taylor Bean during the time period that servicing was

being released would have been placed in suspense and forwarded to Saxon."[36]

On August 19, 2009, Lansburg hand wrote some notes on a copy of her August 6,

2009 email.  The notes indicated that plaintiffs' loan payments should now be sent to Saxon

at a Fort Worth, Texas address and that plaintiffs' loan number was now 2000558478.[37]

---

[30]Id.

[31]Id.

[32]Id.

[33]Exhibit G at 1, Saxon Declaration, Docket No. 123.

[34]Id.

[35]Id.

[36]Saxon Declaration at 4, ¶ 17, Docket No. 123.

[37]Email from Lansburg to Christian, Exhibit F, Saxon Declaration, Docket No. 123.

On September 4, 2009, Lansburg called Saxon and "said she had just completed her 3rd pmt of her HAMP trial, but the check hasn't cleared yet."[38]  The Saxon representative advised Lansburg that "we are in the process of having those checks endorsed so that's probably the reason."[39]  Lansburg advised the Saxon representative that "she is mailing her adjusted pmt today" and the representative gave Lansburg "the correct address."[40]  In her notes about this phone call, Lansburg indicated that she spoke to Courtney Brown who told her to mail her payments to an Irving, Texas address and told her that Brown "will notify the dept & let them know we made our 3rd & final trial pmt."[41]

On September 9, 2009, Lansburg called Saxon and advised that "she's completed all 3 pmts of her HAMP trial, but one still hasn't been cashed."[42]  The Saxon representative advised that she "would revw w/ my mgr, the HAMP mgr and our attys and c/b this afternoon."[43]  On September 9, 2009, another Saxon representative noted that "Borrower is in active TM that was transferred to Saxon, waiting on additional guidance from Legal on

---

[38]Saxon Servicing Notes at Lansburg000719, Exhibit E, Saxon Declaration, Docket No. 123.

[39]<u>Id.</u>

[40]<u>Id.</u>

[41]Exhibit F at 1, Saxon Declaration, Docket No. 123.

[42]Saxon Servicing Notes at Lansburg000718, Exhibit E, Saxon Declaration, Docket No. 123.

[43]<u>Id.</u>

how to move forward with the conversion into ... modification. BX is about to be done and FC hold has been requested to ensure we are able to act on this loan. 3rd payment is in the mail, per [client]."[44]

On September 29, 2009, a Saxon representative noted that "$2770.44 was sent over when file was acquired[.] There is one payment of $1739.70 included which is the TM payment. 3 by 3 was completed, one payment was returned."[45] Another Saxon representative noted on September 29, 2009, that "there is enough money left in suspense for 3rd pmt to satisfy the 3 trial mod adv CJ3 of this. Cust will need to continue to make TM pmt while we complete spec project."[46]

On October 15, 2009, Saxon sent a letter to plaintiffs advising them that "Saxon is working to complete the Home Affordable Modification Program you began several months ago with Taylor, Bean...."[47] Saxon advised that it was "in the process of completing the necessary review of [the] loan" and that plaintiffs should "continue to make the agreed upon trial period payment until we notify you otherwise."[48]

---

[44]Id.

[45]Id. at Lansburg000715.

[46]Id.

[47]Exhibit I at 1, Saxon Declaration, Docket No. 123.

[48]Id.

On November 17, 2009, Lansburg sent a loan payment to Saxon in the form of a cashier's check.[49]  Lansburg advised Saxon that she

> wrote checks for September and October.  Since we are going through bankruptcy, and you have not cashed our checks, I have withdrawn the money from our account.  I did not want that amount of money sitting in our checking account while going through bankruptcy.  I am afraid the bankruptcy court will take it.  Before putting [the] September and October payment through, please contact me and I will replace those checks with a cashier's check.[50]

Plaintiffs made another payment of $1740 in December 2009[51] and two payments of $1740 each in February 2010.[52]

On January 27, 2010, a Saxon representative spoke with Lansburg about

> missing HMP docs.  Needed updated paystubs 4506-T and explanation of the profit on her 08 tax return.  Sd that she was a real estate agent on the side but hasn't done anything in over 6 months.  Also sd that they rec. a monthly check from the State because they take in foster children.  Currently they have 5 children they are watching but are about to go back to 3 which is why the checks might be higher for now.  She needs us to just hold the checks.[53]

---

[49]Exhibit J, Saxon Declaration, Docket No. 123.

[50]Id.

[51]Exhibit H at Lans000797, Saxon Declaration, Docket No. 123.

[52]Id. at Lans000796.  Plaintiffs also made a payment of $1740 in April 2010.  Id.

[53]Saxon Servicing Notes, Exhibit E at Lansburg000705-06, Saxon Declaration, Docket No. 123.

Lansburg faxed "the 4506T Form, current paystubs, W2 for 2009, and Letter of Explanation" to Saxon's Loan Modification department on February 8, 2010.[54]

On February 11, 2010, the beneficial interest in plaintiffs' Deed of Trust was assigned to defendant Federal Home Loan Mortgage Corporation.[55] Saxon remained the servicer on plaintiffs' loan.

On February 24, 2010, Saxon sent plaintiffs a letter requesting additional documents so it could complete its review of whether plaintiffs would qualify for a permanent HAMP agreement.[56] Plaintiffs were advised that they had until March 31, 2010 to submit the additional documentation.[57]

On February 26, 2010, Saxon sent plaintiffs a letter advising that Saxon was "unable to provide you with a Home Affordable Modification Program agreement...."[58] Saxon indicated that plaintiffs were being denied a loan modification under HAMP because they "did not make all of the required Trial Period Plan payments by the end of the trial period."[59]

---

[54]Exhibit 22 at 1, DeFine Declaration, Docket No. 131.

[55]Exhibit K at 1, Saxon Declaration, Docket No. 123.

[56]Exhibit 21 at 1, DeFine Declaration, Docket No. 131.

[57]Id. at 2.

[58]Exhibit L at 1, Saxon Declaration, Docket No. 123.

[59]Id.

On March 3, 2010, Lansburg called Saxon "in response to [a] letter she received requesting missing documents that she faxed on 2/18/10[.]"[60]  The Saxon representative noted that it "appears the mod may have been denied due to failure to make trial mod payments."[61]  The Saxon representative "sent email to TF3 and KM5 requesting a call back to [client] re: loan mod status."[62]  On March 5, 2010, TF3 noted that "removed in error, all payments made. Sent email. Request to unlock tricalc."[63]  And, on March 8, 2010, TF3 noted "Tricalc: Mod. Sent to UW."[64]

On March 5, 2010, Lansburg faxed additional financial documentation to Saxon's Loan Modification department.[65]

On May 7, 2010, Lansburg called Saxon in response to a breach letter she had received.[66]  A Saxon representative told Lansburg

> that per our system she has been deemed not eligible for the HAMP modification.  Advised I would look into and call back. Upon further research found that [client] was behind in pay-

---

[60]Saxon Servicing Notes, Exhibit E at Lansburg000705, Saxon Declaration, Docket No. 123.

[61]Id.

[62]Id. at Lansburg000704.

[63]Id.

[64]Id.

[65]Exhibit 23, DeFine Declaration, Docket No. 131.

[66]Saxon Servicing Notes, Exhibit at Lansburg000701, Saxon Declaration, Docket No. 123.

> ments. She has claimed that she made all payments and that some payments had not cleared. She said she was going through bankruptcy and that she could not keep funds in her account as the trustee could liquidate it.[67]

Lansburg noted that she was told that they "were pulled from H[A]MP program. Notes in system just say 'No Recommendation.'"[68] Lansburg further noted that she was told that "once denied, can't get back into H[A]MP."[69]

On May 26, 2010, Lansburg emailed Chaunda Jackson, a Saxon employee, to

> follow[] up on our loan. You were sending a request to extend foreclosure to 7/12 pending investigation for the H[A]MP program. We started the H[A]MP program with TB & W and it was transferred to Saxon last year when we made our 3[rd] and final trial payment. Saxon took us out of the H[A]MP program because they said we are behind on our payments and we are not.[70]

Jackson forwarded the email to Dre Guilford because plaintiffs' loan was part of his managed portfolio.[71] Lansburg emailed Guilford again on June 14, 2010, after she discovered that the Property had been sold that afternoon at a trustee sale.[72]

---

[67]Id.

[68]Exhibit 2 at 1, Pomeroy Declaration, Docket No. 122.

[69]Id.

[70]Exhibit 25 at 2, DeFine Declaration, Docket No. 131.

[71]Id. at 1.

[72]Id.

On June 14, 2010, the Federal Home Loan Mortgage Corporation bought the Property at the trustee sale for $240,000.[73] At the time of the foreclosure sale, plaintiffs owed $482,178.96.[74]

On June 17, 2010, Lansburg requested that Saxon provide copies of the trial contract, copies of all payments made, and any documents showing that plaintiffs were notified of the June 14, 2010 trustee sale.[75] Plaintiffs received a packet of documents from Saxon but it contained "the information on a Saxon customer out of California."[76] Lansburg avers that she "contacted Saxon in August 2010 advising them of their error and since that time, Saxon has not produced any [of the] documents I requested...."[77]

Although the Property had already been foreclosed on, on September 3, 2010, Saxon sent plaintiffs a letter advising that they had been denied a permanent HAMP loan modification because they "did not make all of the required Trial Period Plan payments by the end of the trial period."[78] The letter advised plaintiffs that they had 30 days in which to contact Saxon "to discuss the reason for non-approval for a HAMP modification or to discuss

---

[73]Exhibit M, Saxon Declaration, Docket No. 123.

[74]Id.

[75]Exhibit 26 at 1, DeFine Declaration, Docket No. 131.

[76]Declaration of Jeanette K. Lansburg at 6, ¶ 45, Docket No. 132.

[77]Id. ¶ 46.

[78]Exhibit 24 at 1, DeFine Declaration, Docket No. 131.

alternative loss mitigation options that may be available to you."[79] The letter also advised

that "you will not lose your home during this 30-day period...."[80] Lansburg avers that she and

her husband "were not aware we were denied a loan modification until we receiv[ed]" this

letter.[81]

In September 2010, defendants gave plaintiffs written notice to vacate and in October

2010 filed a forcible detainer action in state court. Plaintiffs remained living in the Property

during the state court proceedings and finally moved out of the Property in June 2013.

Plaintiffs' only remaining claim is a claim for breach of contract. Plaintiffs allege that

they had a "written TPP contract" with defendants and that defendants "breached the terms

of the TPP by failing to comply with their duties which included either offering a loan

modification on the 91st day after the TPP was executed or denying such modification."[82]

The parties' cross-motions on plaintiffs' breach of contract claim are now ready for

disposition as is defendants' motion to strike certain factual assertions in plaintiffs' response

to defendants' motion for summary judgment and the parties' requests for sanctions.[83]

---

[79]Id.

[80]Id.

[81]Lansburg Declaration at 6, ¶ 41, Docket No. 132.

[82]Plaintiffs' Second Amended Complaint at 9-10, ¶¶ 57, 67, Docket No. 86.

[83]Defendants requested sanctions in connection with their motion to strike; plaintiffs
requested sanctions in their response to defendants' motion to strike.

<u>Discussion</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. <u>Id.</u> at 255. "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." <u>T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 (9th Cir. 1987).

"In an action on a contract plaintiff has the burden of proof to show, 1) a contract, 2) a breach, and 3) damages." <u>Thunderbird Metallurgical, Inc. v. Arizona Testing Labs.</u>, 423 P.2d 124, 126 (Ariz. Ct. App. 1967)). In order to satisfy the Statute of Frauds, a contract "must state the terms and conditions of all the promises constituting the contract." <u>Broadway Realty & Trust, Inc. v. Gould</u>, 665 P.2d 580, 581 (Ariz. Ct. App. 1983) (citation omitted).

"For an enforceable contract to exist, there must be an offer, acceptance, and consideration."

Tabler v. Industrial Com'n of Ariz., 47 P.3d 1156, 1158 (Ariz. Ct. App. 2002).

Defendants first argue that plaintiffs' breach of contract claim fails because no contract between defendants and plaintiffs existed. Defendants argue that the TPP itself was not a contract and that because a loan modification agreement was never executed, there was no contract to breach. Defendants argue that the TPP itself cannot be the contract that was allegedly breached because the Lender never signed the TPP.[84] The TPP expressly provides that "[t]his Plan will not take effect unless and until both I and the Lender sign it and the Lender provides me with a copy of this Plan with the Lender's signature."[85] Moreover, defendants argue that it is undisputed that neither Taylor Bean nor Saxon ever agreed to change the date of the July and August payments from the first of the month to the eighth of the month. Thus, defendants argue that at best plaintiffs made a counter-offer, which Taylor Bean never accepted.

However, as plaintiffs are quick to point out, in Corvello, the Ninth Circuit "held that '.. a TPP Agreement offered pursuant to HAMP is a contract, and a party to that contract may sue for breach if the lender violates a term contained within the four corners of the TPP.'"

Meixner v. Wells Fargo Bank, N.A., 101 F. Supp. 3d 938, 947 (E.D. Cal. 2015) (quoting

Lazo v. Caliber Home Loans, Inc., No. 1:13–CV–2015 AWI JLT, 2015 WL 590663, at *5

---

[84]Exhibit D at LANS000482, Saxon Declaration, Docket No. 123.

[85]Id. at LANS000480.

(E.D. Cal. Feb. 12, 2015)).  Under <u>Corvello</u>, a borrower has a valid claim for breach of the TPP agreement if the borrower has "fulfilled all of [his] obligations under the TPP, and the loan servicer has failed to offer a permanent modification[.]"  <u>Corvello</u>, 728 F.3d at 884.  If plaintiffs timely made all three TPP payments, then it was a breach of the parties' agreement for defendants not to "send a signed Modification Agreement offering to modify the loan...."  <u>Id.</u> at 833.

Plaintiffs were required to make three TPP payments prior to the Modification Effective Date, which was September 1, 2009.  There is no dispute that plaintiffs made their first and second TPP payments prior to September 1, 2009.[86]  As to whether plaintiffs made their third payment prior to September 1, 2009, the material facts are in dispute.  There is evidence that suggests that plaintiffs did not make this payment until sometime in September 2009, such as Saxon's declaration that Saxon never received "[p]laintiffs['] third TPP payment from Taylor Bean"[87]and the September 4 servicing note in which the Saxon representative noted that Lansburg "said she just completed her 3rd pmt of her HAMP trial" and that "she is mailing her adjusted pmt today...."[88]  There is also Lansburg's hand-written

---

[86]Defendants argue that plaintiffs' second payment was late, which it may have been if it were due on July 1, 2009, but there is no dispute that the second payment was made prior to September 1, 2009.

[87]Saxon Declaration at 4, ¶¶ 17-18, Docket No. 123.

[88]Saxon Servicing Notes at Lansburg000719, Exhibit E, Saxon Declaration, Docket No. 123.

notes about the September 4, 2009 phone call which indicate that the Saxon representative "will notify the dept & let them know we made our 3rd & final trial pmt."[89]

But there is also evidence that suggests that plaintiffs' third payment was sent in August 2009, such as the fact that check number 1118 appears to have been dated August 8, 2009 and was made out to Sparta Special Servicing. While it is undisputed that check number 1118 did not clear plaintiffs' bank until September 14, 2009, that could have been a result of the change in servicer in August. Lansburg's bank statement for the period of August 11, 2009 through September 10, 2009 provides further evidence that check number 1118 was written in August 2009. That bank statement shows that check number 1117 cleared on August 19, 2009 and that check number 1119 cleared on August 31, 2009.[90] A logic inference to draw from this is that Lansburg issued check number 1118 in August and that processing of the check was delayed due to the change in servicer to Saxon.

There is also the matter of Lansburg's declaration filed in connection with the cross-motions for summary judgment in which she avers that she issued the third payment (check number 1118) on August 8, 2009.[91] Defendants, however, move to strike this averment because they argue that it contradicts Lansburg's deposition testimony. The court may strike "'sham' testimony upon making a finding of fact that" the testimony "'flatly contradict[s]

---

[89]Exhibit F at 1, Saxon Declaration, Docket No. 123.

[90]Exhibit 1 at LANS000748, Pomeroy Declaration, Docket No. 122.

[91]Lansburg Declaration at 5, ¶ 31, Docket No. 132.

-19-

earlier testimony in an attempt to create an issue of fact and avoid summary judgment.'"

Karpenski v. American General Life Companies, LLC, 999 F. Supp. 2d 1218, 1224 (W.D. Wash. 2014) (quoting Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262 (9th Cir. 1991)). Defendants argue that Lansburg's averment in paragraph 31 of her declaration that she "sent check 1118 in the amount of $1740.00 that I issued to my servicer on August 8, 2009"[92] directly contradicts her deposition testimony.

At her October 8, 2012 deposition, Lansburg testified as follows:

> Q. Then there's a notation here to Courtney Brown and a date, September 4, 2009. Do you see that?
>
> A. I do.
>
> Q. And then below that, can you read into [the] record what you wrote?
>
> A. "Mail payment to this address. She will notify the department and let them know we made our third and final trial payment."[93]

At her April 12, 2017 deposition, Lansburg testified as follows when asked about a September 9, 2009, Saxon servicing note:

> Q: It says, "Continued ... modification. Bankruptcy is about to be done and foreclosure hold has been requested to ensure we are able to act on this loan. Third payment in the mail, per CVI," which I'll represent is customer. Do you know if you called in about that time frame?

---

[92]Id.

[93]October 8, 2012 Lansburg Deposition at 128:4-13, Exhibit 3, Pomeroy Declaration, Docket No. 122.

A:       Possibly.

Q:       And so that third payment would have been the one that you had issued about four days earlier. Does that sound right?

A.       It sounds correct.

Q:       So that check that cleared on the [14th], that probably would have been your third check, the third payment?

A.       Correct.[94]

Defendants argue that Lansburg testified twice that she sent the third TPP payment on or around September 5, 2009, and thus her averment that she sent it on August 8, 2009, directly contradicts this testimony.

Similarly, defendants move to strike Lansburg's averment in paragraph 33 of her declaration that defendants sent the August 19, 2009 letter about the change in servicer from Sparta to Saxon, "approximately 11 days after I sent our final payment to Taylor Bean & Whitaker...."[95] Defendants argue that this averment contradicts Lansburg's deposition testimony that she sent plaintiffs' third TPP payment in September 2009.

Lansburg's prior testimony does not contradict her averments in paragraphs 31 and 33. Lansburg never definitively testified that she sent the third TPP payment in September 2009. Rather, she testified that she _probably_ sent it then. Her deposition testimony leaves

---

[94]April 12, 2017 Lansburg Deposition at 102:7-22, Exhibit 5, Pomeroy Declaration, Docket No. 122.

[95]Lansburg Declaration at 5, ¶ 33, Docket No. 132.

open the possibility that she sent the third payment in August 2009, a possibility that is supported by evidence in the form of the copy of check number 1118, which is dated 8/8/09 and made out to Sparta Special Servicing.[96]

At oral argument, defense counsel made much of the fact that on check number 1118, the Taylor Bean loan number was crossed out and the Saxon loan number was written on the check instead. He suggested that this indicated that Lansburg sent the check to Saxon after she spoke to the Saxon representative on September 4, 2009. But, there is evidence in the record that indicates that Lansburg spoke to a Saxon representative on August 19 and was provided the Saxon loan number at that time.[97] While this evidence seems to contradict Lansburg's averment that she sent the check on August 8, 2009, it also indicates that Lansburg knew the Saxon loan number prior to the September 4, 2009 call. The fact that the Saxon loan number was written on check number 1118 is not conclusive evidence that this check was not sent to Saxon until September 2009.

Finally, in terms of evidence that suggests that the third payment was sent in August 2009, there are the March 5 and March 8, 2010 Saxon servicing notes. The March 5 note read: "removed in error, all payments made. Sent email. Request to unlock tricalc."[98] The

---

[96]Exhibit 3, Supplemental DeFine Declaration, Docket No. 150.

[97]Exhibit F at 1, Saxon Declaration, Docket No. 123.

[98]Saxon Servicing Notes at Lansburg000704, Exhibit E, Saxon Declaration, Docket No. 123.

March 8 note read: "Tricalc: Mod. Sent to UW."[99] These notes suggest that at some point Saxon realized that plaintiffs had made all three of their TPP payments and that a loan modification was drafted and sent to underwriting.[100] Defendants contend that this may not be a reasonable inference to draw from these notes given that Saxon had sent a HAMP denial letter in February 2010. But given that in March 2010, Saxon was requesting further documentation from plaintiffs, it is not at all clear that Saxon was treating plaintiffs' loan modification as being denied as of the date of the February 2010 letter. The March 2010 servicing notes are further evidence that the facts surrounding when plaintiffs made their third TPP payment are in dispute. A reasonable jury viewing the facts in the light most favorable to plaintiffs could conclude that plaintiffs' third TPP payment was sent in August 2009 while a reasonable jury viewing the facts in the light most favorable to defendants could conclude plaintiffs' third TPP payment was not sent until September 2009.

But even if the facts are in dispute as to whether plaintiffs timely made their third TPP payment, which they are, defendants argue that they are still entitled to summary judgment on plaintiffs' breach of contract claim because they did not breach the contract. Defendants argue that the evidence shows that they reviewed plaintiffs' application for a loan modification and after review, then denied plaintiffs' application and advised plaintiffs of such on February 26, 2010. As set out above, on February 26, 2010, Saxon sent plaintiffs

---

[99]Id.

[100]Plaintiffs have requested that defendants produce this draft modification, but, according to plaintiffs, it has never been produced.

a letter advising that Saxon was "unable to provide you with a Home Affordable Modification Program agreement" because plaintiffs "did not make all of the required Trial Period Plan payments by the end of the trial period."[101]

Although plaintiffs argue that the HAMP regulations require that on the 91st day, the servicer or lender is required to either offer a loan modification or deny the modification in writing, plaintiffs have never cited to any specific HAMP regulation containing this requirement. Plaintiffs also dispute that they ever received the February 2010 letter. Lansburg avers that plaintiffs "were not aware we were denied a loan modification until we received the formal letter stating such in September 2010."[102] Defendants move to strike this averment because it contradicts Lansburg's prior testimony. At her April 2017 deposition, Lansburg was asked about some hand-written notes she made in May 2010. She was asked: "so at least as of May 7, you knew you were pulled from HAMP and you couldn't get back into the program; is that fair?"[103] Lansburg replied: "That's semi-fair, I guess. I mean it couldn't be pulled from the trustee's sale is the way I understood it."[104]

Lansburg's averment does not necessarily contradict her deposition testimony. But even if this averment were stricken, Lansburg never testified that plaintiffs actually received

---

[101]Exhibit L at 1, Saxon Declaration, Docket No. 123.

[102]Lansburg Declaration at 6, ¶ 41, Docket No. 132.

[103]April 12, 2017 Lansburg Deposition at 142:20-22, Exhibit 5, Pomeroy Declaration, Docket No. 122.

[104]Id. at 142:23-24.

the February 2010 letter and the issue here is not whether plaintiffs knew that they had been denied a loan modification prior to foreclosure; the issue is whether defendants complied with the terms of the TPP agreement. The TPP agreement contemplates that the lender will provide the borrower with a loan modification if the borrower has provided the requested financial information and made the three trial period payments prior to the Modification Effective Date, which here was September 1, 2009. The TPP agreement provides that time is of the essence,[105] so it may have been a breach of the TPP agreement for defendants to wait until February 2010 to advise plaintiffs that they were being denied a loan modification for the alleged failure to make all their TPP payments by September 1, 2009. A reasonable jury viewing the facts in the light most favorable to plaintiffs could conclude that defendants breached the TPP agreement by not promptly informing plaintiffs that they had been denied a loan modification.

But even if there were a contract and even if they breached that contract, defendants argue that plaintiffs' breach of contract claim still fails because plaintiffs have suffered no contract damages. "[D]amages for breach of contract are those damages which arise naturally from the breach itself or which may reasonably be supposed to have been within the contemplation of the parties at the time they entered the contract." All American School Supply Co. v. Slavens, 609 P.2d 46, 48 (Ariz. 1980). "Consequential damages are recoverable only where they arise naturally from the breach of a contract and where they

---

[105]Exhibit D at Lans000481, Saxon Declaration, Docket No. 123.

were in the contemplation of the parties" at the time the contract in question was executed.

Miscione v. Bishop, 636 P.2d 149, 152 (Ariz. Ct. App. 1981).

Plaintiffs' damages allegations are in paragraphs 54 and 55 of the Second Amended Complaint. In paragraph 54, plaintiffs allege that

> as a result of defendants['] conduct, [they] have lost their home, lost their monthly income as foster parents, lost the monthly TPP payments paid and were forced to incur debts in being forcibly removed from their home by the constable, including incurring attorney fees and costs in defending against a forcible detainer, moving costs and expenses in setting up temporary housing for themselves.[106]

In paragraph 55, plaintiffs allege that "Lansburg suffered numerous medical bills from stress directly related to the [d]efendants failure' to comply with the TPP."[107] Defendants argue that none of these are recoverable as contract damages in this case.

loss of the Property. Damages for breach of a contract to loan money "include loss of equity if the breach of the loan agreement caused the borrower to lose ownership of its assets." United Calif. Bank v. Prudential Ins. Co. of Amer., 681 P.2d 390, 448 (Ariz. Ct. App. 1983). At the time plaintiffs lost ownership of the Property, plaintiffs had no equity in the Property. It is undisputed that on June 14, 2010, the date of the trustee sale, plaintiffs

---

[106]Plaintiffs' Second Amended Complaint at 8, ¶ 54, Docket No. 86.

[107]Id. at ¶ 55. At oral argument, plaintiffs' counsel suggested that plaintiffs were seeking damages for now having a foreclosure on their credit report. Plaintiffs did not plead such damages and cannot add damages via oral argument.

owed $482,178.96 and that the Property sold for $240,000.[108]  Plaintiffs cannot prove any damages related to the loss of the Property.  Plaintiffs' suggestion that it was possible that at some point in the future that they would have some equity in the Property is nothing more than speculation and damages cannot be based on speculation  See Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc., 738 F.3d 960, 970 (9th Cir. 2013) ("damages" must "be capable of measurement based upon reliable factors without undue speculation").

loss of income as foster parents.  Plaintiffs became foster parents in 2009 and they contend that they lost their income as foster parents when they had to move out of the Property.  The payments plaintiffs received for being foster parents were not "income." "[F]oster care maintenance payments cover the costs of 'food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation.'"  Berg-Thaemert v. Thaemert, Case No. 1 CA-CV 06-0767, 2007 WL 5462303, at *3 (Ariz. Ct. App. Oct. 23, 2007) (quoting 42 U.S.C.A. § 675(4)(A)).  "These payments 'do not include reimbursement in the nature of salary for the exercise by the foster family of ordinary parental duties.'"  Id. (quoting U.S. Dep't of Health and Human Services, Child Welfare Policy Manual § 8.3B(1) (2007)).  Plaintiffs cannot recover the loss of the payments for their foster children as breach of contract damages.

---

[108]Exhibit M at 1, Saxon Declaration, Docket No. 123.

loss of TPP payments.  Plaintiffs claim that the loss of the loan payments that they made from June 2009 through June 2010 are direct contract damages.  "Generally speaking, a commitment to perform a preexisting contractual obligation has no value."  <u>Auerbach v. Great Western Bank</u>, 74 Cal. App. 4th 1172, 1185 (Cal. Ct. App. 1999).  The TPP agreement expressly provided that "any payment [the borrower] make[s] under this Plan shall be applied to the amounts [the borrower] owe[s] under the Loan Documents and shall be not be refunded to" the borrower.[109]

While the TPP payments plaintiffs made are not recoverable as breach of contract damages, the loan payments plaintiffs made in November 2009, February 2010, and April 2010 are recoverable.  If plaintiffs' loan modification had been promptly denied in September 2009 due to untimely TPP payments, plaintiffs presumably would have stopped making any payments because a foreclosure would have been imminent.  Any additional loan payments were a result of defendants' alleged breach of the TPP agreement.

eviction costs.  Plaintiffs claim that they incurred $11,308 in attorney's fees in connection with their eviction from the Property.  These costs were  reasonably foreseeable at the time of the HAMP modification.   If plaintiffs were wrongfully denied a loan modification, as they may have been, then it was reasonably foreseeable that plaintiffs would resist eviction.  Plaintiffs may  recover their eviction costs if they prevail on their breach of contract claim.

---

[109]Exhibit D at LANS000481, Saxon Declaration, Docket No. 123.

<u>moving and temporary housing costs</u>.  Defendants argue that these are not damages that were contemplated when plaintiffs executed the TPP agreement.  Defendants argue that plaintiffs had ample notice regarding the possible loss of the Property and had ample time to find alternative housing.  Lansburg has consistently testified that plaintiffs never looked into alternative housing.[110]

Plaintiffs made no argument in response either in their briefing or at oral argument.[111]  This claim for damages is treated as abandoned.  <u>See</u> <u>Sanchez v. Maricopa County</u>, Case No. CV 07–1244–PHX–JAT, 2008 WL 4057002, *7 (D. Ariz. Aug.27, 2008) ("If a non-moving party only partially responds to a motion for summary judgment, then the party abandons the claims that it does not address in its opposition to the motion").

<u>medical bills</u>.  Lansburg contends that the stress she suffered due to the loss of her home and the loss of her foster children contributed to two strokes that she had in 2014 and 2015.  Plaintiffs seek to recover the medical bills associated with treatment Lansburg received related to this stress.

Defendants argue that plaintiffs have failed to show that Lansburg's stress and health issues were foreseeable at the time that they executed the TPP agreement.  Defendants also argue that Lansburg cannot prove that her health conditions were caused by defendants'

---

[110]April 12, 2017 Lansburg Deposition at 148:17-149:4; 163:20-164:9, Exhibit 5, Pomeroy Declaration, Docket No. 122.

[111]Defense counsel mentioned the moving and temporary housing damages in his argument; plaintiffs' counsel did not.

alleged breach of contract. Defendants argue that the evidence shows that plaintiffs had a number of stressful events happening in their lives around the time they executed the TPP agreement, including that they had filed for bankruptcy. Defendants also point out that the nurse practitioner who was treating plaintiff, Ms. Frasca, stated that she could not opine that stress caused Lansburg's strokes because "she had other contributing factors which resulted in her" hypertension which caused the strokes.[112]

In response, Lansburg avers that "the stress I underwent due to the loss of my home and my foster children contributed to my health issues and I suffered two strokes during this time for which I had to undergo medical treatment."[113] Defendants move to strike this averment because it contradicts Lansburg's deposition testimony. At her May 9, 2017 deposition, Lansburg was asked: "What do you think Ms. Frasca meant when she said she could not differentiate because [you] had other contributing factors?"[114] Lansburg answered:

> She said that there's lots of factors that could cause it, and so nobody could put it in writing.... There's nobody that could say, yes, it did cause it, or no, it didn't cause it....[[115]]

---

[112]May 9, 2017 Deposition of Jeanette Kim Lansburg at 77:2-5, Exhibit 6, Pomeroy Declaration, Docket No. 122.

[113]Lansburg Declaration at 7, ¶ 56, Docket No. 132.

[114]May 9, 2017 Lansburg Deposition at 77:11-13, Exhibit 6, Pomeroy Declaration, Docket No. 122.

[115]Id. at 77:14-17.

Lansburg's averment does not contradict her deposition testimony. If defendants' breached the TPP agreement, it was foreseeable that Lansburg would suffer some stress. Plaintiffs have offered very little in the way of proof that Lansburg's medical issues were caused by this stress. But, Lansburg's declaration is sufficient to defeat defendants' motion for summary judgment as to plaintiffs' damages related to Lansburg's medical expenses.

Finally, the court takes up the issue of sanctions. Defendants seek sanctions because Lansburg's declaration was a "sham" declaration. Rule 56(h), Federal Rules of Civil Procedure, provides in relevant part:

> If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court--after notice and a reasonable time to respond--may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result.

Defendants argue that there can be no question that Lansburg's declaration was offered for no other purpose than to attempt to create a triable issue of material fact and that Lansburg and her attorney had to know that it contradicted her prior deposition testimony. Thus, defendants seek $5,625 in attorney's fees, which they contend are the attorney's fees they have incurred in filing their reply to their motion for summary judgment and their response to plaintiffs' cross-motion.[116]

---

[116]See Declaration of Tim Pomeroy [etc.] at 2, ¶¶ 2-3, Docket No. 139.

As discussed above, Lansburg's declaration did not necessarily contradict her deposition testimony. Her declaration was not a sham; and defendants are not entitled to sanctions on this basis.

Buried in their reply to defendants' motion to strike, plaintiffs seek sanctions against defendants for raising frivolous defenses. This request is denied. Defendants' defenses and arguments in this case have not been frivolous.

## Conclusion

Defendants' motion for summary judgment[117] is denied in part and granted in part. It is granted as to plaintiffs' claim for damages based on the loss of the Property, the loss of foster care income, and moving and temporary housing costs. It is otherwise denied.

Plaintiffs' cross-motion for summary judgment[118] is denied.

Defendants' motion to strike and request for sanctions[119] is denied.

Plaintiffs' request for sanctions[120] is denied.

DATED at Phoenix, Arizona, this 17th day of October, 2017.

/s/ H. Russel Holland
United States District Judge

---

[117]Docket No. 120.

[118]Docket No. 136.

[119]Docket No. 141.

[120]Docket No. 149.